**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TB HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF SAUGUS, SCOTT CRABTREE, and JOHN DOES 1-10,<br><br>Defendants. | No. 1:25-cv-12330-JEK |

**MEMORANDUM AND ORDER ON PLAINTIFF'S SPECIAL MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM PURSUANT TO THE MASSACHUSETTS ANTI-SLAPP STATUTE**

**KOBICK, J.**

This case involves a dispute between plaintiff TB Holdings, LLC, a real estate developer, and the defendants, the Town of Saugus and its town manager, Scott Crabtree, over a real estate development project known as Essex Landing. In its complaint, TB Holdings claims that the Town and Crabtree have violated various constitutional and statutory rights by subjecting it to arbitrary and discriminatory treatment. The Town and Crabtree, in turn, assert a counterclaim against TB Holdings for abuse of process. The counterclaim alleges that, in order to obtain regulatory approval for its development, TB Holdings engaged in a campaign to intimidate and coerce the defendants by initiating litigation and disparaging Crabtree's reputation. Pending before the Court is TB Holdings' special motion to dismiss the counterclaim pursuant to the Massachusetts anti-SLAPP statute, M.G.L. c. 231, § 59H.[1] Since TB Holdings makes a threshold showing that its statements about Crabtree's alleged misconduct are petitioning activities and the defendants fail to carry their

[1] The acronym "SLAPP" stands for "strategic litigation against public participation."

burden of demonstrating that those activities are devoid of any reasonable factual support or any arguable basis in law, the motion will be granted.

## BACKGROUND

The following facts are recounted based on the allegations in the verified complaint, the counterclaim, and the evidentiary submissions filed in connection with the special motion to dismiss. *See* M.G.L. c. 231, § 59H ("[T]he court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."); *Blakesley v. Marcus*, 158 F.4th 90, 101 (1st Cir. 2025).

TB Holdings, a developer of land, buildings, and improvements, applied to construct a mixed-used development known as Essex Landing in the Town of Saugus in October 2015. ECF 7, at 23-34 ("Counterclaim"), ¶¶ 1-2, 21-22, 28; ECF 1, ¶ 9. Essex Landing was the first major development project for the Business Highway Sustainable Development district, a new zoning district enacted by the Town on May 4, 2015. Counterclaim, ¶ 22. The development initially encompassed seven buildings—a mixed-used building, a café, three apartment buildings, and two hotels—and a garage. *Id.* ¶¶ 1, 27. The Town approved TB Holdings' Master Plan and site plan in 2015 and 2016, respectively. *Id.* ¶¶ 1-2, 28; ECF 1, ¶¶ 15-16. In October 2021, TB Holdings sought approval from the Saugus Planning Board to sell certain undeveloped parcels—ones that were to have been used for the hotels and garage—to Wingate Living, which would instead build an assisted living facility. Counterclaim, ¶¶ 33, 37; ECF 1, ¶¶ 21-22. This change led to extended disagreement and litigation between the Town and TB Holdings. Counterclaim, ¶¶ 39, 58-64.

A source of this conflict involved a $200,000 check that TB Holdings made out to the Town. In February 2022, TB Holdings sought a meeting with town officials, including Crabtree, to discuss the proposed assisted living facility on the undeveloped lots. ECF 1, ¶¶ 23-25. Following

a meeting with Crabtree in May 2022, TB Holdings gave a $200,000 check to the Town. Counterclaim, ¶ 6; ECF 1, ¶¶ 35, 38, 43. The Town claims that this check was a voluntary donation to support the Town's Parks and Recreation Program, and that the payment was not related to, nor would it benefit, TB Holdings' development at Essex Landing. Counterclaim, ¶¶ 3, 7-8. TB Holdings, on the other hand, claims that Crabtree requested the check in exchange for removing obstacles to the Essex Landing development and to receive approval for building the assisted living facility on the undeveloped lots. ECF 1, ¶¶ 26, 30, 42, 45. The $200,000 remains in the Town's account, where it was initially deposited. Counterclaim, ¶ 10.

After making the $200,000 payment, TB Holdings continued to face regulatory hurdles in connection with the Essex Landing development, including requirements imposed by the Town to obtain peer reviews and special permits. ECF 1, ¶¶ 57-59, 61-63, 70, 72. In September 2022, TB Holdings had to undergo a peer review, and the Planning Board required it to perform additional work. *Id.* ¶¶ 58-59. Two months later, in November 2022, TB Holdings filed a declaratory judgment action in Massachusetts Land Court to determine whether the assisted living facility could include independent living units. *Id.* ¶ 61. In advance of a Planning Board meeting in January 2025 on TB Holdings' application to freeze zoning on the site, TB Holdings alleges, Crabtree instructed board members not to attend the meeting, and the present members voted to deny the application. *Id.* ¶¶ 62-68.[2] The Town further required TB Holdings to acquire a special permit from the Board of Selectmen for its variances. *Id.* ¶¶ 69-70, 72. There are two ongoing proceedings

[2] Planning Boards are the "subdivision control agency in all cities and towns, except Boston." *Del Duca v. Town Adm'r of Methuen*, 368 Mass. 1, 12 (1975); *see* M.G.L. c. 41, §§ 81A-GG. As the town manager, Crabtree has the power to appoint members of the Planning Board. *See* Charter of the Town of Saugus, Massachusetts, art. II, § 15 (all five members of the Planning Board "shall be appointed by the town manager").

between the Town and TB Holdings in Massachusetts Land Court based on TB Holdings' appeals of decisions by the Planning Board and Zoning Board. *Id.* ¶ 73.

After making the $200,000 payment to the Town, TB Holdings began telling others, including John O'Brien, the chairman of the Town's Planning Board, that Crabtree had embezzled $200,000. Counterclaim, ¶ 12. TB Holdings made similar statements to local reporters, including representatives of the Saugus Advocate and Boston.com, and distributed its legal complaint through a professional publicist before it was served on the Town and Crabtree. *Id.* ¶¶ 13-14. As a result, local media covered the allegations, and Crabtree was asked about the payment and whether he had in fact embezzled money. *Id.* ¶ 15. The Town believes that TB Holdings attempted to embarrass, intimidate, and undermine town officials, including Crabtree. *Id.* ¶¶ 16-20.

In August 2025, TB Holdings filed in this Court a verified complaint asserting claims against the Town, Crabtree, and John Does 1-10. ECF 1, ¶¶ 2-4. TB Holdings alleges, under 42 U.S.C. § 1983, violations of the Takings Clause (Count I), procedural due process (Count II), substantive due process (Count III), and equal protection (Count IV) under the Fifth and Fourteenth Amendments to the U.S. Constitution. *Id.* ¶¶ 91-134. It also alleges violations of the Fair Housing Act (Count V) and Massachusetts Public Records Law (Count VII), and it seeks a declaratory judgment (Count VI). *Id.* ¶¶ 135-44.

The defendants filed an answer and asserted a counterclaim against TB Holdings for abuse of process. Counterclaim, ¶¶ 65-72. TB Holdings then filed a special motion to dismiss the counterclaim pursuant to the Massachusetts anti-SLAPP statute, M.G.L. c. 231, § 59H. ECF 12. After the defendants opposed that motion and TB Holdings filed its reply, the Court held a hearing and took the motion under advisement. ECF 19, 22, 24.

## DISCUSSION

Under the Massachusetts anti-SLAPP statute, TB Holdings "may bring a special motion to dismiss" asserting that the defendants' counterclaim is "based on [TB Holdings'] exercise of its right of petition under the constitution of the United States or of the commonwealth." M.G.L. c. 231, § 59H. The statute defines a party's "exercise of its right of petition" to include "any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government." *Id.*

In *Bristol Asphalt, Co., Inc. v. Rochester Bituminous Products, Inc.*, the Supreme Judicial Court ("SJC") set out a two-stage framework for assessing special motions to dismiss under the Massachusetts anti-SLAPP statute. 493 Mass. 539, 555-60 (2024). In the first stage, TB Holdings, as the proponent of the special motion to dismiss, "must 'make a threshold showing through the pleadings and affidavits that the claims against it are based on [its] petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" *Id.* at 555 (quoting *Duracraft Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 167-68 (1998)). If TB Holdings fails to meet this burden, the special motion to dismiss is denied. *Id.* at 555-56. If TB Holdings carries its burden, the Town and Crabtree, as the opponents of the special motion to dismiss, then must demonstrate at stage two that TB Holdings' petitioning activity "'‘was devoid of any reasonable factual support or any arguable basis in law'" and caused them "'‘actual injury.'" *Id.* at 557 (quoting

M.G.L. c. 231, § 59H). If the Town and Crabtree fail to make that showing, the special motion to dismiss is granted. *Id.* This second stage imposes a "high bar" for a special motion opponent, one that effectively requires the Town and Crabtree to demonstrate that TB Holdings' petitioning activity was a "sham." *Id.* at 558, 566.

## I. <u>Abuse of Process Counterclaim.</u>

TB Holdings argues that the abuse of process counterclaim is based solely on its petitioning activities, including its filing of lawsuits and statements to third parties and the media. An abuse of process claim has three elements: "(1) process was used, (2) for an ulterior or illegitimate purpose, (3) resulting in damage." *477 Harrison Ave., LLC v. JACE Boston, LLC*, 483 Mass. 514, 526-27 (2019) (quotation marks omitted). An actionable abuse of process counterclaim "will always be, at least in part, based on a special movant's petitioning activities" and "may be brought even where the plaintiff has a meritorious claim." *Id.* at 525, 527 (quotation marks omitted).

To warrant dismissal, TB Holdings must show that the counterclaim is "based solely on its petitioning activity." *Columbia Plaza Assocs. v. Ne. Univ.*, 493 Mass. 570, 579 (2024). An abuse of process counterclaim "will not be dismissed . . . where the special motion opponent 'alleges that the [special motion proponent] engaged in any conduct germane to [the] abuse of process claim, apart from [the] invocations of process, which can provide a substantial basis for [the] claim.'" *Allegaert v. Harbor View Hotel Owner LLC*, 497 Mass. 328, 339 (2026) (alterations in original) (quoting *477 Harrison Ave., LLC v. JACE Boston, LLC*, 477 Mass. 162, 169 (2017)); *see Keystone Freight Corp. v. Bartlett Consol., Inc.*, 77 Mass. App. Ct. 304, 316 (2010) (abuse of process claim was not based solely on the special motion proponent's petitioning activity, but also on its administrative misconduct prior to the action).

At the first stage of the *Bristol Asphalt* framework, "a court need only conduct a facial review of a special motion opponent's pleading to identify which factual allegations serve as the basis for a particular claim." 493 Mass. at 561. The defendants' counterclaim challenges three of TB Holdings' alleged activities. The first concerns TB Holdings' filing of lawsuits. Counterclaim, ¶ 5. The second involves statements TB Holdings made to boards and commissions that its Essex Landing project should advance because of the $200,000 payment. *Id.* ¶ 11. The third relates to TB Holdings' statements to Planning Board chairman John O'Brien, as well as to a publicist and reporters from the Saugus Advocate and Boston.com, that Crabtree embezzled $200,000. *Id.* ¶¶ 12-14. TB Holdings contends that these activities are solely petitioning activities.

The defendants do not meaningfully dispute that the first form of challenged activity—TB Holdings' filing of lawsuits—constitutes petitioning activity. The SJC has repeatedly held that "commencing a lawsuit is a quintessential example of engaging in petitioning activity." *Allegaert*, 497 Mass. at 337; *see 477 Harrison Ave*, 483 Mass. at 520 (collecting cases). The counterclaim next alleges that TB Holdings urged members of the Town's boards and commissions to advance its project because of its payment to Crabtree. Lobbying government officials is another textbook example of petitioning activity. The statute provides that "any written or oral statement made before or submitted to a[n] . . . executive . . . body" or "any written or oral statement made in connection with an issue under consideration or review by a[n] . . . executive . . . body" is a form of petitioning. M.G.L. c. 231, § 59H. And as the SJC has explained, petitioning encompasses a "very broad" range of activities, including statements made to "influence, inform, or at the very least, reach governmental bodies—either directly or indirectly." *N. Am. Expositions Co. Ltd. P'ship v. Corcoran*, 452 Mass. 852, 861-62 (2009). Though the defendants do not specify the statements made by TB Holdings to the board and commission members, TB Holdings' alleged attempt to

influence municipal officers falls within the scope of petitioning activities. *See Town of Hanover v. New England Reg'l Council of Carpenters*, 467 Mass. 587, 590-91 (2014) (petitioning activity under the anti-SLAPP statute includes activities such as "writing to government officials, . . . lobbying . . . [and] filing agency protests or appeals" (quotation marks omitted)).

The counterclaim's third challenged activity involves TB Holdings' statements to O'Brien, a publicist, and local journalists about Crabtree's alleged extortion. Petitioning activity includes "any written or oral statement *made in connection with* an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding." M.G.L. c. 231, § 59H (emphasis added). The defendants contend that TB Holdings' statements were not made in connection with proceedings before local boards and commissions. TB Holdings responds that its statements were made in connection with ongoing proceedings and were intended to reach public authorities responsible for permitting decisions.

Whether TB Holdings' communications were made "in connection with" ongoing permitting decisions by the Planning Board and Zoning Board and lawsuits in the Land Court turns on whether there was "a plausible nexus between the statement[s] and the governmental proceeding." *Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141, 149 (2017), *overruled on other grounds by Bristol Asphalt*, 493 Mass. at 542, 548. To determine whether a plausible nexus exists, courts "look to objective indicia of a party's intent to influence a governmental proceeding." *Id.* The intent to influence is "manifested in statements that are 'closely and rationally related to the [governmental proceeding]' and 'in furtherance of the objective served by governmental consideration of the issue under review.'" *Id.* (alterations in original) (quoting *Plante v. Wylie*, 63 Mass. App. Ct. 151, 159 (2005)).

There is plainly a plausible nexus between TB Holdings' statements to O'Brien, as the Chairman of the Planning Board, and TB Holdings' ongoing proceedings before the Planning Board. TB Holdings' comments stemmed from its belief that it was forced to pay the Town $200,000 to ensure there would be no subsequent delays related to its Essex Landing development and the assisted living facility. After it paid Crabtree $200,000, TB Holdings continued to have hearings before the Planning Board. That Board also required TB Holdings to perform additional work on the project site and rejected its application to freeze zoning on the site after Crabtree told Planning Board members not to attend the meeting. ECF 1, ¶¶ 59, 63, 67-68. TB Holdings has appealed that decision in Land Court. *Id.* ¶ 73. It is plausible that TB Holdings made statements suggesting that Crabtree embezzled $200,000 to notify O'Brien of Crabtree's alleged misconduct and to influence the Planning Board to consider TB Holdings' applications on the merits, notwithstanding the fact that board members are appointed by Crabtree.

There is also a plausible nexus between TB Holdings' statements to the publicist and journalists, on the one hand, and ongoing governmental proceedings, on the other. The defendants contend that, unlike comments made directly to decisionmakers like O'Brien, these statements were not intended to influence any particular municipal proceeding or reach an intended audience of decisionmakers. The Court disagrees. When TB Holdings made its statements, it had an ongoing subdivision application with the Planning Board in January 2025, an application for new variances with the Zoning Board in April 2025, and a special permit that required approval from the Board of Selectmen. *Id.* ¶¶ 62-63, 68-70, 72. Information related to the $200,000 payment was "neither 'tangential' nor 'unrelated to governmental involvement.'" *Blanchard*, 477 Mass. at 150 (quoting *Global NAPs, Inc. v. Verizon New England, Inc.*, 63 Mass. App. Ct. 600, 607 (2005)). Instead, TB Holdings sought to reach and inform municipal board members that Crabtree had exerted undue

influence on matters related to the Essex Landing project and to persuade those decisionmakers to approve its applications and permits. Though not made to decisionmakers directly, TB Holdings' comments to the publicist and press about Crabtree's alleged corruption bore a plausible nexus to ongoing municipal proceedings and had a high likelihood of reaching board members. *See id.* at 151 (statements made to the press were "likely to influence" decisionmakers within the government); *Global NAPs*, 63 Mass. App. Ct. at 606-07 (the "crucial characteristic" of petitioning activity is the "potential or intent to . . . influence, inform, or bring about governmental consideration of the issue"). The Court thus concludes that TB Holdings' statements were petitioning activities under the Massachusetts anti-SLAPP statute, and that the defendants' abuse of process counterclaim has no other substantial basis besides TB Holdings' petitioning activities.

Because TB Holdings has met its threshold burden, the anti-SLAPP statute requires allowance of its special motion to dismiss unless the defendants can show that TB Holdings' exercise of its right to petition "'was devoid of any reasonable factual support or any arguable basis in law'" and caused them actual injury. *Bristol Asphalt*, 493 Mass. at 557 (quoting M.G.L. c. 231, § 59H). To prove petitioning is "'devoid' of *any* reasonable factual support or *any* arguable basis in law," the defendants must show, by a preponderance of the evidence, that the petitioning activities were effectively "frivolous." *Id.* at 557, 560.

The defendants have not met their heavy burden. They have submitted no evidence—through affidavits or otherwise—that could give rise to a strong inference that TB Holdings' lawsuits, statements to municipal board and commission members, and statements regarding Crabtree's alleged extortion lacked reasonable factual support or an arguable legal basis. The only sworn facts before the Court—those contained in TB Holdings' verified complaint—suggest otherwise. *See Town of Hanover*, 467 Mass. at 596 n.11 (declining to "equate a special motion to

dismiss pursuant to" M.G.L. c. 231, § 59H with "a motion to dismiss pursuant to" Mass. R. Civ. P. 12(b)(6)). To take one example, TB Holdings asserts that Crabtree hired a Special Municipal Counsel who serves as an intermediary between himself and several municipal boards. ECF 1, ¶¶ 61-62. Before a January 2025 Planning Board meeting on TB Holdings' subdivision application, Crabtree instructed the Special Municipal Counsel and multiple members of the Planning Board not to attend the meeting, and the present board members voted to deny the application. *Id.* ¶¶ 63-68. While Crabtree does not sit on the Planning Board, he appoints all five board members. Charter of the Town of Saugus, Massachusetts, art. II, § 15. In another example offered by TB Holdings, the Special Municipal Counsel required TB Holdings to seek a special permit from the Board of Selectmen after the Zoning Board had already approved TB Holdings' variances. ECF 1, ¶¶ 69-70, 72.

The defendants maintain that TB Holdings alleges mere conspiracies in order to insinuate that Crabtree had control over municipal boards and commissions. But the defendants "do not actually provide evidence that contradicts" TB Holdings' factual averments regarding Crabtree's influence over the Planning Board and his role in directing the Special Municipal Counsel's involvement in municipal board decisions. *Hidalgo v. Watch City Constr. Corp.*, 105 Mass. App. Ct. 148, 153 (2024). And although the parties dispute the purpose behind the $200,000 payment, there is "reasonable factual support" for TB Holdings' petitioning activity criticizing Crabtree. *Bristol Asphalt*, 493 Mass. at 557. The defendants have failed to carry their burden to show that TB Holdings' exercise of its petitioning rights was devoid of any reasonable factual support or any arguable basis in law. Accordingly, TB Holdings' special motion to dismiss the defendants' abuse of process counterclaim will be granted.

## II. Attorneys' Fees and Costs.

The Massachusetts anti-SLAPP statute provides that the Court "shall award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters," if it grants the special motion to dismiss. M.G.L. c. 231, § 59H. TB Holdings requests, and is entitled to, attorney's fees and costs pursuant to the statute. *See Corcoran*, 452 Mass. at 872 ("[T]he award of attorney's fees" under Section 59H "is mandatory."). TB Holdings is therefore granted leave to file a separate application documenting its reasonable attorney's fees and costs.

## CONCLUSION AND ORDER

For the foregoing reasons, TB Holdings' special motion to dismiss the defendants' abuse of process counterclaim pursuant to the Massachusetts anti-SLAPP statute, ECF 12, is GRANTED. TB Holdings must file an application for attorney's fees and costs within 14 days of this Order. The defendants will thereafter have 14 days to respond.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 2, 2026